HAWKEYE SECURITIES FIRE INSURANCE COMPANY, Appellee, v. CENTRAL TRUST COMPANY OF DES MOINES, Appellant.

No. 39270.

NOVEMBER 21, 1929.

REHEARING DENIED APRIL 16, 1930.

*Howe & Howe* and *Ben J. Gibson,* for appellant.

*Carr, Cox, Evans & Riley,* for appellee.

STEVENS, J.—I.  This action is brought in equity, to compel the specific performance of an alleged written agreement to repurchase a certain note and mortgage negotiated by appellant

to appellee on November 6, 1919. The alleged agreement, written upon the stationery of appellant, and signed "Taylor Grimes, Vice President-Loans," is as follows:

"We have this day sold to your company a certain farm mortgage, signed and executed by Milo D. Morse and wife, Cecile Morse, dated October 1st, 1915, for $8,000.00— secured by 160 acres of land in Mower County, Minn., described as the Northeast Quarter of Section 10, Township 102, Range 14. Said note secured thereby drawing your company 5½% interest. In consideration of the purchase of this mortgage by your company, the Central Trust Company agrees to collect all interest and remit to your company, without charge and generally look after the loan the same as if our own. We further agree in the case this mortgage is ever foreclosed for nonpayment that we will repurchase mortgage for its face value plus all interest and costs on same; said mortgage being recorded in book 51, page 60, of the records of Mower County, Minnesota."

Default having been made in the payment of the note and interest, according to its terms appellee tendered the instrument back to appellant, and demanded performance of the alleged agreement to repurchase. Subsequently, appellee foreclosed the mortgage, and caused the land to be sold, and the title acquired in the name of the appellee. Thereupon, a deed, executed by appellee, was tendered to appellant, and a new demand made for the specific performance of the contract. The demand was refused, and this action followed.

The defenses interposed by appellant are: (a) That the vice president exceeded his authority in the execution of the written instrument; (b) that it is *ultra vires*; and (c) that the agreement was waived and abrogated by the subsequent conduct of the plaintiff, and cannot thereby be specifically enforced. To these propositions appellee set up ratification and estoppel.

The law applicable to transactions by agents in which their authority to conduct same, as well as the law relating to alleged *ultra vires* contracts of corporations, is well settled in this and

 most jurisdictions. It is the contention of appellee that the consideration for the purchase of the note and mortgage was in part the agreement on the part of appellant to repurchase the same; that, when appellant was apprised of the transaction, and performance demanded, the matter was referred to the executive committee and board of directors of appellant corporation, and that, with full knowledge of all of the facts touching the transaction, they elected to retain the amount paid, and refused to carry out the contract; and that, by such refusal, the act of the vice president was. fully ratified and confirmed.

If the right to make the alleged agreement to repurchase is not void because it is prohibited by law or is contrary to public policy, then the contention of appellee, if sustained by the evidence, that appellant, by the acts of its executive committee and board of directors, ratified and confirmed the contract, is sound. It has been many times held by this court that a corporation may ratify an *ultra vires* act so as to bind itself, when it has received and retains benefits on account thereof. *Bobzin v. Gould Balance Valve Co.*, 140 Iowa 744; *Iowa Drug Co. v. Souers*, 139 Iowa 72; *State ex rel. Carroll v. Corning Sav. Bank*, 139 Iowa 338; *Bankers Mut. Cas. Co. v. First Nat. Bank*, 131 Iowa 456; *Vermont Farm Mach. Co. v. De Sota Co-op. Cream. Co.*, 145 Iowa 491; *Garrison Can. Co. v. Stanley*, 133 Iowa 57; *Twiss v. Guaranty Life Assn.*, 87 Iowa 733; *Traer v. Lucas Prospecting Co.*, 124 Iowa 107; *Fidelity Ins. Co. v. German Sav. Bank*, 127 Iowa 591; *Field v. Eastern Bldg. & Loan Assn.*, 117 Iowa 185; *Wisconsin Lbr. Co. v. Greene & Western Tel. Co.*, 127 Iowa 350. See, also, 3 Fletcher's Cyclopedia of Corporations, Sections 1543—1547.

The exceptions universally recognized to the foregoing rule are that, when the contract is prohibited by statute, or is against public policy, it cannot be ratified.

The scope of the business of appellant, as stated in its articles of incorporation, is as follows:

"To loan money, to buy, own, improve, rent, exchange, sell or otherwise deal in and handle real estate and personal property for pecuniary profit; to loan money on real estate and personal property; to buy, sell, hold and deal generally in notes,

mortgages, bonds, securities and other evidences of indebtedness; * * *. It shall also have the power to issue and sell the debentures or bonds of the company and receive time deposits and issue drafts on its depositories. * * * It shall also have the further and additional powers which may at any time be granted by the legislature of the state of Iowa, or which may at any time be given by law to companies of like nature.''

Section 9222, Code, 1927 (Section 1855, Code of 1897), provides that state and savings banks may contract indebtedness or liability for necessary expenses in managing and conducting their business, for deposits, and to pay depositors; provided that, in pursuance to the order of the board of directors previously adopted, other liabilities not exceeding in amount the capital stock of the corporation, may be incurred.

Section 9284, Code, 1927, authorizes trust companies and state and savings banks existing under the provisions of Chapter 416 of the Code, in addition to all other powers granted, when authorized by their articles of incorporation, ''to issue drafts upon depositories, and to purchase, invest in, and sell promissory notes, bills of exchange, bonds, mortgages, and other securities.''

We find nothing in the statute which prohibited the appellant corporation from entering into the contract in question. If, therefore, the execution thereof was previously authorized  or subsequently ratified, with full knowledge by appellant of the facts, then, under the authorities cited, it is bound thereby, unless the agreement was void because contrary to public policy. It seems to us that the authority conferred upon appellant by its articles of incorporation, considered in the light of the statute, effectively disposes of appellant's contention that the agreement is void because contrary to public policy. The power to buy, sell, and deal generally in notes, mortgages, bonds, securities, and other evidences of indebtedness, it seems to us, might be held to include the incidental power on the part of the corporation to guarantee the payment of negotiable instruments sold, as well as to make agreements to repurchase the same. It is unnecessary for us to pass on this question in this case.

In a discussion based upon Section 1850, Code, 1897, re-

lating to savings banks, we said, in *State ex rel. Carroll v. Corning Sav. Bank*, supra:

"* * * the design in enacting the section of the statute first quoted seems to have been to obviate any doubt as to the power of savings banks to engage in the general banking business, restricted only by such limitations as appear to have been thought essential to the preservation of the beneficial features of the early savings banks, and especially those calculated to shield savings placed in their keeping from exploitation and loss. Having authority to deal in commercial paper, they necessarily must assume the obligation incidental thereto, and among these are those of guaranty and indorsement in transferring the same."

Appellant cites two decisions of the Supreme Court of Minnesota to sustain the contention that the agreement is void because contrary to public policy. The decision of this court in *Engen v. Sheridan County State Bank*, 163 Minn. 1 (203 N. W. 434), was rested upon the finding there made that the agreement, which was similar to the one in controversy, created a mere option, and that, as the same was not accepted, no recovery could be had. The other case cited by counsel is *Eberlein v. Stockyards Mtg. & Tr. Co.*, 164 Minn. 323 (204 N. W. 961). The point decided in that case was that the officers of the trust company did not, solely because they had authority to buy securities for the company, possess implied authority to agree to repurchase a negotiable instrument on demand at its face value. The court there held that power to make a contract of repurchase was not necessarily incident thereto. The court further, in the course of its decision, said that implied authority to do the unusual and unnecessary things involved would not be upheld, in part, because of its inherent danger to the safety and stability of the corporation.

In a later case, not cited by appellant, the Minnesota Supreme Court, in *Farmers & Mech. Sav. Bank v. Crookston State Bank*, 169 Minn. 249 (210 N. W. 998), went further, and held that an agreement by the bank to repurchase a negotiable instrument in which the only interest of the bank was a small commission received on the transaction was void, because contrary to public policy. The court, however, held that its conclusion was not out of harmony with the recognized authority

of a bank to guarantee the payment of a note, upon the negotiation thereof. The court said:

"In making such a guaranty a bank is within its corporate powers, however bad its policy may be in guaranteeing long-time mortgages."

It will be observed that none of the cited cases support appellant's contention, under the facts of this case, that the agreement in question is void because contrary to public policy. We are of the opinion that it should not be so treated.

II. We come now to what seems to us to be the decisive question in the case.

If it be granted that the vice president, as agent for the corporation, had neither express nor implied authority to bind it by the writing in evidence, did the corporation, its principal, with full knowledge of the facts, subsequently ratify the agreement, and by retaining the consideration paid by appellee in the transaction, estop itself from setting up either its claim of *ultra vires* or the want of authority on the part of its agent to enter into the agreement? It is suggested by counsel for appellant, in argument, that the transaction, so far as it involved the alleged agreement to repurchase, was concealed from the corporation for many years, and until a complete change in conditions had intervened, and that upon no principle of equity was appellant obligated to return the consideration and accept the tender of either the note and mortgage or the deed.

On this point it is further argued by counsel that the agreement is too ambiguous and uncertain in its terms to permit of enforced specific performance; that appellant was not bound to accept a deed to the mortgaged premises in lieu of the note and mortgage; that the consideration paid by appellee was not in cash, but in other securities, which appellant was no longer able to return. The appellee did tender the note and mortgage to appellant when demand was first made for the repurchase thereof, but this tender has not been kept good. The remedy does not require proof of the restoration of the *status quo*, as the relief sought is specific performance, and not rescission. It is immaterial that appellant is no longer able to return the cash or securities received for the note and mortgage, nor, indeed, would appellee be compelled to accept the same, if tendered.

The agreement to repurchase on its face implied payment in cash. The language of the instrument is not as clear as it might easily have been made, but the agreement to repurchase is in case of foreclosure. If foreclosure of the mortgage was contemplated, appellant was bound to accept whatever was received as a result thereof. The foreclosure of the mortgage was by notice and sale, and no judgment was obtained against the makers of the note. The land was bid in for the amount of the claim, plus other items properly included therein. Full disclosure of the transaction and of the repurchase agreement was made to appellant at the time the tender was first made of the note and mortgage and the repurchase thereof demanded. The action of the executive committee and the board of trustees followed these disclosures. The action taken was in the light thereof. Under the authorities cited above, appellant could not retain the benefits and escape the obligation of the written contract upon the ground that its agent exceeded its authority, or that the contract was *ultra vires*. It was estopped to urge either as a defense to this action. It could not deny the authority of the agent and at the same time claim the benefits of the transaction. This is elementary in the law of principal and agent.

Other matters are discussed by counsel, but they are disposed of by what we have already said, and do not call for particular consideration. The conclusion reached necessarily involves the consideration of all matters urged by appellant.

III. The suggestion is made that a receiver has been appointed, who has taken charge of the business and assets of appellant, and that for this reason this action will not lie. The receiver was appointed some months after the action was commenced. It was not abated by the appointment thereof. *Weigen v. Council Bluffs Ins. Co.*, 104 Iowa 410.

We reach the conclusion that the judgment and decree of the court below is right, and it is, therefore,— *Affirmed.*

ALBERT, C. J., and FAVILLE, KINDIG, and GRIMM, JJ., concur.

EVANS, J., took no part in the decision of this case.

292

MORLING, DE GRAFF, and WAGNER, JJ., dissent.

MORLING, J. (dissenting).—The remedy asked for is the equitable one of specific performance. The letter which, as a contract, is sought to be enforced by specific performance does not, on plaintiff's own evidence, correctly express the agreement and intent of the parties, which were that defendant "would agree to repurchase or take it [the security sold] back at any time if the same became in default;" not, "if this mortgage is ever foreclosed, * * * we will repurchase * * *" Neither the agreement as it was made nor the letter sued upon as the contract, when properly interpreted, as it seems to me, purports, or can be fairly said to be intended, to have authorized the extinguishment of the personal liability of the maker and assumptors of the obligation sold, or to bind defendant to purchase the real estate in lieu of the personal obligations of the mortgagors and assumptors after such obligations in the mortgage have been by the plaintiff voluntarily extinguished. The contract is one for breach of which the common-law remedies are well settled and adequate. If the contract sued upon were of such a nature that equity might grant specific performance of it, still plaintiff has not brought itself within the conditions on which equity will grant that remedy.

Defendant sold to plaintiff mortgages and other securities. The number of the transactions does not appear. Among them was a sale by defendant to plaintiff of the mortgage note and interest coupons in suit. This mortgage is upon real property in Minnesota. The petition is based upon a contract alleged to have been evidenced by a letter dated November 6, 1919, from defendant to plaintiff, as follows:

"Gentlemen: We have this day sold to your company a certain Farm Mortgage, signed and executed by Milo D. Morse and wife, Cecile Morse, dated October 1st, 1915, for $8000.00— secured by 160 acres of land in Mower County, Minn., described as the Northeast Quarter of Section 10, Township 102, Range 14. Said note secured thereby drawing your Company 5½ per cent interest.

"In consideration of the purchase of this mortgage by your company, the Central Trust Company agrees to collect all interest and remit to your Company, without charge and generally

look after the loan the same as if our own. We further agree in the case this mortgage is ever foreclosed for non-payment that we will repurchase mortgage for its face value plus all interest and costs on same; said mortgage being recorded in Book 51, Page 60, of the records of Mower County, Minnesota.''

Defendant attacks the validity of the agreement. I assume, for the purpose of this case, that this attack may not be sustained, and that the agreement is binding upon defendant. I therefore confine my discussion to a consideration of the question whether the plaintiff is entitled to the remedy of specific performance.

The makers of the note and mortgage made default in payment. Plaintiff thereupon presented the paper to defendant, with a demand for its repurchase. Defendant repudiated the agreement evidenced by its above-mentioned letter, and refused to recognize liability upon it. The plaintiff then foreclosed the mortgage according to the laws of Minnesota, by notice and sale. The foreclosure was not in court, and plaintiff got no personal judgment. At the sale, plaintiff purchased the mortgaged property for the full amount owed, including interest and costs. Meantime, the real property had been twice conveyed, the purchaser in each instance assuming payment of the mortgage. No action was taken to enforce the personal liability of the maker of the note or of the assumptors. At the expiration of the year allowed in Minnesota for redemption, the plaintiff became invested with the legal title to the mortgaged premises. The sale was had May 16, 1925. Petition in this suit was filed August 29, 1925. On October 29, 1926, and May 13, 1927, plaintiff paid taxes on the mortgaged premises for the years 1924, 1925, and 1926, for which, in addition to the amount of the principal and interest on the note and the costs of foreclosure, plaintiff seeks to recover. Plaintiff tenders to defendant the sheriff's certificate of sale under which the legal title to the mortgaged premises is now, as stipulated, vested in plaintiff, and abstract of title.

The property sold by defendant to plaintiff was incorporeal, personal property. It is described in the letter upon which the suit is founded as ''a certain mortgage * * * dated October 1, 1915, for $8,000, secured by 160 acres of land in Mower County, Minnesota.'' The agreement further refers to it as the ''said

note secured thereby drawing your company 5½ per cent interest.'' The agreement further designates the property sold (and the property to be repurchased) as follows:

''In consideration of the purchase of this mortgage by your company the Central Trust Company agrees to collect all interest * * * and generally look after the loan * * *''

The agreement to repurchase is this:

''We further agree in case this mortgage is ever foreclosed for non-payment that we will repurchase mortgage for its face value plus all interest and costs.''

The property which by the decree the defendant is compelled to repurchase is the real property described in the mortgage. Plaintiff's position is that, under the terms of the agreement, it was required to proceed to foreclose the mortgage, and that, after it had purchased the mortgaged premises at foreclosure, the defendant was required to purchase them of plaintiff, at face value and interest on the mortgage note, with costs of foreclosure and taxes paid by plaintiff on the mortgaged premises after foreclosure. Otherwise stated, plaintiff contends that, though it purchased (incorporeal) personal property, defendant bound itself to purchase from it real property; that, though plaintiff purchased the personal obligation of the mortgagor, and acquired, incidentally to it, the personal obligations of subsequent purchasers of the mortgaged premises, defendant is bound to repurchase the mortgaged premises at the price placed upon them at the foreclosure sale by the plaintiff, stripped of the personal obligations of the mortgagors and subsequent grantees, which, as is conceded, have been discharged as a result of the foreclosure sale.

By the agreement sued upon, plaintiff was given the option to require defendant to repurchase. Plaintiff was not bound to resell. Defendant reserved no right to compel a resale. Defendant's agreement, therefore, in this particular was merely one giving plaintiff an option to resell to defendant. *Wilson v. Holub,* 202 Iowa 549; *Engen v. Sheridan County State Bank,* 163 Minn. 1 (203 N. W. 434). Until plaintiff exercised its option, there was no contract of resale. The evidence is that plaintiff did, upon the mortgagor's default, and before foreclosure, ex-

ercise its option, and accordingly demanded of defendant that defendant repurchase the property. The property was then still personal in form. On the exercise of the option and making of the demand, the defendant (we may assume) was legally bound to perform its covenant to repurchase. The relationship between the parties then was that of seller and purchaser, under an executory contract by defendant to purchase the securities from plaintiff. The plaintiff's remedies for defendant's refusal to purchase were: (1) To store or retain the property for the defendant and sue defendant for the entire purchase price; (2) to sell the property, acting as agent of the defendant for this purpose, and recover the difference between the contract price and the price obtained on such resale; (3) to keep the property as plaintiff's own property, and recover the difference between the market price at the time and place of delivery and the contract price. *Dustan v. McAndrew*, 44 N. Y. 72, adopted by this court in *Hamilton v. Finnegan*, 117 Iowa 623. The law laid down in these cases was reaffirmed and applied to an agreement similar to that under consideration (between these same parties) in *Hawkeye Sec. Fire Ins. Co. v. Central Tr. Co.*, 208 Iowa 573, decided since the rendition of the judgment here appealed from. Plaintiff's position, however, is that, under the terms of the agreement involved here, the defendant was bound to repurchase only after foreclosure, and that plaintiff was required to foreclose.

Particular attention has been called to the terms of the agreement. It variously refers to the subject of the sale as "a mortgage," as "said note," as "the loan." The property in fact consisted of a promissory note and farm mortgage securing it, and incidental documents and rights. The clause "we further agree in case this mortgage is ever foreclosed for non-payment that we will repurchase the mortgage" literally is an absurdity—a self-contradiction. "Foreclosure" of the mortgage would extinguish it. The mortgaged premises would be sold. The purchaser at foreclosure would acquire title. The lien of the mortgage would be at an end. The mortgage itself (and the note secured by it) would become defunct,—worthless paper. Clearly, the defendant did not agree to purchase a foreclosed and defunct mortgage (or note) for its face value and interest, nor does plaintiff claim that such was the agreement. Plain-

tiff's contention, in effect, is that the defendant agreed to purchase the farm on which the mortgage debt was formerly a lien, and which plaintiff has since acquired; and it is the purchase of the farm acquired by plaintiff at foreclosure, not the purchase of the mortgage (or note and mortgage), that plaintiff by this suit is seeking to compel the defendant to make. The agreement does not say that defendant will purchase of plaintiff the mortgaged premises or the farm in lieu of the note and mortgage which defendant sold to plaintiff, nor would such an agreement be reasonable. The mortgage is dated October 1, 1915. When it matured, is not shown. The agreement sued on is dated November 6, 1919. There is no limitation on the time within which defendant agrees to repurchase. On the contrary, the agreement is that, if the mortgage "is ever foreclosed for nonpayment," defendant will repurchase. Literally, it might be allowed to run; it might be extended or renewed indefinitely. The improvements might be destroyed; the land might go to waste. Conditions might happen utterly destructive of its value, and, though the defendant never in terms agreed to purchase the farm, it might, according to plaintiff's theory, be compelled, on plaintiff's exercise of an option in the indefinite future, to purchase a piece of depreciated land for the amount of the principal of the note sold by defendant to plaintiff and an indefinite amount of interest and costs, and though the value of the paper as it was at the time the contract was made, had been utterly and voluntarily by plaintiff destroyed.

The phrase "ever foreclosed for non-payment," on which plaintiff relies, is contrary to the agreement to "repurchase mortgage * * * said mortgage being recorded in Book 51 * * *" It is not only unreasonable to suppose that the word intended to be used was "foreclosed," but the actual agreement, as testified to by plaintiff's vice president in his direct examination, in support of plaintiff's main case, is that defendant "would agree to repurchase or take it back at any time if the same became in default." He says the sewer bonds were bought "under a similar guaranty." Plaintiff is seeking, therefore, equitable enforcement of a contract in a sense which plaintiff's own evidence shows is absurd, and was different from defendant's verbal agreement. It may be inferred (though the evidence does not so show) that the letter on which the suit is based was dictated

or written by defendant's official. Even so, on plaintiff's evidence it did not express the true agreement, and it had no right, as it claims to have done, to rely on what it knew to be the incorrect and unreasonable language used, and so specifically enforce it. 36 Cyc. 605, 608.

Specific performance, as plaintiff well argues, is awarded "because of the inadequacy of the remedy at law, and because equity can 'do more perfect and complete justice' " than a court of law. *Fisher v. First Tr. & Sav. Bank,* 206 Iowa 1105. See, also, *Richmond v. Dubuque & S. C. R. Co.,* 33 Iowa 422, 480; 4 Pomeroy's Equity Jurisprudence (4th Ed.) 1401. In ordinary cases founded on contracts of sale of personal property, the remedy at law for damages is adequate. *McGraw Co. v. Zonta Tire & Rubber Co.,* 194 Iowa 685. Specific performance is not a matter of right, except in such cases as are brought within the conditions upon which equity (usually case of sale of real property) awards it. *Lockie v. Baker,* 206 Iowa 21; *Wilson v. Holub,* 202 Iowa 549; *Shisler v. Catholic Cem. Assn.,* 207 Iowa 306. The contract, before equity will specifically enforce it, must be found to be unambiguous, clear, and certain, and its terms such that it cannot reasonably be misunderstood. *Fenton v. Clifton,* 204 Iowa 933; *Donovan v. Murphy,* 203 Iowa 214; *Lockie v. Baker,* 206 Iowa 21; *Shisler v. Catholic Cem. Assn.,* 207 Iowa 306; *In re Estate of Shinn,* 207 Iowa 103; *Schmidt v. Barr,* 333 Ill. 494 (165 N. E. 131) ; *Adcock v. Shaw,* 167 Ga. 710 (146 S. E. 478). Neither the pleadings nor the evidence suggest any reason why the remedy at law was not adequate, complete, and speedy. In *Fisher v. First Tr. & Sav. Bank,* 206 Iowa 1105, decided since the trial below, this court applied these principles to a suit for specific performance of contract to repurchase note and mortgage denying that remedy. Here, the court is asked to compel the defendant, not to repurchase the note and mortgage, but to purchase the mortgaged property. It is asked to do so after the plaintiff has released the personal responsibility of the makers of the notes and the owners of the land who have assumed payment, and after plaintiff has destroyed the possibility of even negotiating with the debtors. It is asking the court to enforce a contract which its own evidence shows was different from the one actually made. Plaintiff, by transforming the property which was the subject

of the contract into an entirely different property, elected to treat and keep it as its own. Plaintiff has thereby debarred itself from recovering the purchase price, and therefore from maintaining its suit for specific performance. *Hawkeye Sec. Fire Ins. Co. v. Central Tr. Co.*, 208 Iowa 573. It seems to me that the judgment should be reversed.

De Graff and Wagner, JJ., join in this dissent.

DE GRAFF, J. (dissenting).—I join in the dissent written by Morling, J. I cannot harmonize the conclusion reached by the majority with certain decisions of this court cited in the dissent of Justice Morling.

There is one special matter which I desire to emphasize, and which, in my judgment, must result in a reversal of this cause. This action was commenced to compel specific performance of a contract to repurchase a certain note and mortgage negotiated by the defendant to the plaintiff. Briefly said, the appellant Trust Company sold to the plaintiff Securities Fire Insurance Company, a certain promissory note signed by Milo D. Morse and his wife. The note was in the principal sum of $8,000. The note was secured by a real estate mortgage covering a quarter section of land in Mower County, Minnesota. This note and mortgage sold to the plaintiff (appellee) under the written agreement set forth in the majority opinion. The Central Trust Company of Des Moines was a bank, as is evidenced by the fact that it is now, and has been for a long time, in the hands of the superintendent of banking of Iowa, as receiver.

The statute defines what indebtedness or liability a state bank can create, and the written agreement to which reference herein is made clearly created a liability on the part of the bank, and is within the prohibition of the statute which defines the indebtedness or liability which a state bank may lawfully contract. The statute is explicit, and provides that a state bank may contract indebtedness or liability for two purposes *only*, to wit: (1) For necessary expenses in managing and transacting its business; (2) for deposits and to pay depositors. But it is provided that, in pursuance to an order previously adopted by the board of directors, "other liabilities not in excess of amount equal to the capital stock may be incurred." Section

9222, Code, 1924. No resolution, as contemplated by the statute aforesaid, was ever adopted.

If it be conceded (for the purpose of argument only) that the Central Trust Company, as a bank, could agree with the appellee Fire Insurance Company, as it did agree, that, in case "this mortgage is ever foreclosed for non-payment, that we will repurchase mortgage for its face value plus all interest and costs on same," the Trust Company was never given that privilege. It may be observed at this point that no notice of any intention to foreclose, nor notice of actual foreclosure, and no notice of the sale, was given to the Central Trust Company. It could not protect itself by being present at the sale or advising in connection therewith, or by exercising the option to repurchase prior to the sale.

The record shows that, on February 18, 1918, after the making of the note and mortgage, which were dated October 28, 1915, Morse and his wife conveyed the property to Edward T. Kenevan, who assumed and agreed to pay the plaintiff's note and mortgage; but in the foreclosure proceedings, to which reference will presently be made, the assuming grantee was not made a party, nor was any personal judgment prayed or obtained against him. On February 28, 1922, Kenevan conveyed the land to one Lundeen, who likewise assumed and agreed to pay plaintiff's note and mortgage involved in this case; but in the said foreclosure proceedings, he was not made a party, nor was any personal judgment prayed or obtained against him. The mortgage, however, was foreclosed; and at the sheriff's sale, the plaintiff Fire Insurance Company bid therefor the total amount due and payable on the note and mortgage, in the sum of $8,670.65, and thereby satisfied *in toto* the mortgage indebtedness, and fully canceled its claim against the makers of the note and mortgage and the subsequent purchasers of the property, who had assumed and agreed to pay the note and mortgage.

Under the statute of Minnesota, and by the terms of the sheriff's certificate, the period of redemption expired on May 16, 1926, and the plaintiff Fire Insurance Company at that time became the sole and absolute and unqualified owner of the property. It follows, therefore, that, by and through the course pursued by the plaintiff, it canceled and surrendered the note and mortgage, and it relinquished its right and the right of the de-

fendant Trust Company, as well, to a personal judgment against Morse and his wife and the subsequently assuming grantees. The plaintiff by its foreclosure suit converted its personal property into real estate, and thereby changed the *status quo* at the time it is claimed the repurchase agreement was made. It may further be observed that all of these acts were done without the knowledge, concurrence, or consent of the Central Trust Company, and resultantly, by the plaintiff's own act, discharged the promissory note and released the liability thereon of all the parties heretofore named.

Under the circumstances, it must be presumed that the promissory note was worth its face value, plus accrued interest. When the note was discharged and released, and the real estate taken in lieu thereof, the Central Trust Company, defendant, had its *status quo* changed, and it was therefore impossible for the plaintiff (appellee) to put the Central Trust Company, defendant, in *status quo*.

The plaintiff could not, on its own motion, have canceled the note and bid in the property for full value without the authority of the Central Trust Company. In my judgment, the tender of plaintiff has not been kept good. The plaintiff has not tendered back what it received. The decree entered should be reversed.